UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ANTIONETTE D. BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | CASE NO. 1: 04-cv-0782-DFH-WTL |
| | ) | |
| COLGATE-PALMOLIVE COMPANY | ) | |
| and HILL'S PET NUTRITION, INC., | ) | |
| | ) | |
| Defendants. | ) | |

ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Antionette Brown worked as an employee at defendant Hill's Pet Nutrition, Inc. ("Hill's"), a manufacturer of pet food. Brown alleges that she was subjected to a discriminatory and hostile work environment based on her sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* She also alleges that her employer interfered with the exercise of her statutory right to medical leave pursuant to the Family and Medical Leave Act of 1993 (FMLA), 29 U.S.C. § 2601, *et seq.* Brown also alleges that defendants retaliated against her for exercising her protected rights in violation of Title VII, the FMLA, and Indiana law. Brown claims that ultimately she was forced to quit her job in June 2003 because of intolerable working conditions.

Defendants Hill's and parent company Colgate-Palmolive have moved for summary judgment on all claims. As explained below, the court grants the

motion.  Colgate-Palmolive was not Brown's employer.  On her Title VII claim against Hill's, Brown has not identified evidence demonstrating that she suffered from actionable sexual harassment.  She also has failed to identify evidence sufficient for finding that she suffered from an adverse employment action that amounted to unlawful sex discrimination in violation of Title VII.  Brown has failed to identify a genuine issue of fact as to whether Hill's retaliated against her for complaining about harassment or discrimination or for exercising her FMLA rights, and she has failed to come forward with evidence on her state law claim that she was retaliated against for filing a worker's compensation claim.  Brown also has failed to come forward with evidence supporting her FMLA entitlement claim.

*Summary Judgment Standard*

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, affidavits, and other materials demonstrate that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Only genuine disputes over material facts can prevent a grant of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material if it might affect the outcome of the suit under the governing law, and a dispute about a material fact

is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Id.* at 248-49.

On a motion for summary judgment, the moving parties must first come forward and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which the parties believe demonstrate the absence of a genuine issue of material fact.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Where the moving parties have met the threshold burden of supporting the motion, the opposing party must "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  Local Rule 56.1 requires the party opposing a motion for summary judgment to identify specific and material factual disputes.

When deciding a motion for summary judgment, the court considers those facts that are undisputed and views additional evidence, and all reasonable inferences drawn therefrom, in the light reasonably most favorable to the non-moving party.  See *Liberty Lobby*, 477 U.S. at 255; *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999).  However, a party must present more than mere speculation or conjecture to defeat a summary judgment motion.  The issue is whether a reasonable jury might rule in favor of the non-moving party based on the evidence in the record.  *Liberty Lobby*, 477 U.S. at 252; *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 637 (7th Cir. 2001).

*Facts for Summary Judgment*

The following facts are either undisputed or reflect the evidence in the light most favorable to plaintiff Brown as the party opposing summary judgment. Adverse facts established by defendants beyond reasonable dispute are necessarily included in the narrative.

Plaintiff Antionette Brown began her employment at Hill's in early June 1996 as a technician in the Packaging area. Hill's Answer ¶ 6; Brown Aff. ¶¶ 2, 33; Brown I Dep. at 17, 19. The production areas at the Hill's Pet Nutrition plant in Richmond, Indiana included Dry Mix/Bulk, Processing, Packaging, and Stretchwrap. Zaleha Aff. ¶ 4. As of April 2001, technicians worked 12-hour shifts according to a two-week rotation schedule. Brown Aff. ¶¶ 12, 13, Ex. 2. Some time after Brown moved to Stretchwrap in 2002, technicians worked set shifts. Brown II Dep. at 31.[1]

Technicians at Hill's were to some extent self-managing. Brown Aff. ¶¶ 9, 10. As one example, Brown testified that team members had some control over the time spent by fellow technicians in the plant's disciplinary process. Brown Aff. ¶¶ 20, 21. Technician compensation and benefits did not vary based on work area or work assignment. Zaleha Aff. ¶ 8. The hourly rates of technicians began and

_____

[1]Three depositions of the plaintiff are part of the record. The court uses the notation "Brown I Dep." to refer to the deposition taken on June 29, 2004. "Brown II Dep." refers to the deposition taken on October 27, 2004. "Brown III Dep." refers to the deposition taken on December 21, 2004.

increased at the same rate, subject to satisfactory attendance and performance, until the pay rates reached parity after two years of service.  Zaleha Aff. ¶ 7.

Each technician team had a team leader (the term "team leader" was changed to "area leader" in early 2001).  Zaleha Aff. ¶ 5; Brown Aff. ¶ 25.  Team and area leaders reported to Operations Manager Darren Haverkamp, who in turn reported to Plant Manager Cathy Zaleha.  Zaleha Aff. ¶ 6.

Brown objects to several incidents that she alleges occurred during her employment at Hill's.  Brown testified that female technicians were given less desirable job assignments and less training than male technicians at the plant.  Brown I Dep. at 32-38 (describing male co-worker training on computer and new line).  She testified that male employees were usually assigned to mentor and train the female employees and that they told female employees what to do.  Brown Aff. ¶¶ 29, 32.  Brown testified that female technicians were typically assigned to do the "dirty work" of daily cleaning, while men were assigned to the "easier" job of preventive maintenance, which involved oiling and adjusting machines and gave them specialized training.  Brown Aff. ¶¶ 30, 47, 48; Brown I Dep. at 33, 44-45; Brown III Dep. at 112.  Brown testified that she would have preferred to perform tasks other than cleaning.  Brown II Dep. at 37-38.  Brown complained to her team leader Scott Grzysbowski about training issues.  Brown I Dep. at 166-68.  She also complained to team leader Everett Jenkins about training and the assignment of tasks.  Brown I Dep. at 166.

Throughout 2001, Brown heard at work vulgar language from male technicians, including Tom Kitchell and Dave Longsworth.  Brown Aff. ¶ 34. Brown testified that Kitchell talked about his personal sexual experiences every day that he and Brown worked together.  Brown Aff. ¶ 35; Brown I Dep. at 75, 78-81.  Kitchell also told Brown that a fellow female co-worker, Carol Isaacs, could not be trained because she was "stupid" and Kitchell referred to Isaacs by several vulgar names.  Brown Aff. ¶¶ 42, 45.

On July 16, 2001, Brown and another female technician from Packaging were placed in the behavioral agreement stage of a Performance Improvement Process ("PIP"), the plant's disciplinary process, for putting the wrong date code on a product.  Brown Aff. ¶¶ 52, 53; Brown I Dep. at 48-49, 152.  Brown's PIP was scheduled to end in July 2002.  Brown Aff. Ex. 3.  Brown was not put into formal coaching before PIP, but she testified that male employees generally were.  Brown Aff. ¶¶ 63, 64.  Brown testified that the male employee who had created her date coding problem by bringing the date coder from another line was not disciplined. Brown Aff. ¶¶ 59, 60.  Brown also testified that, a few weeks after her date code incident, a male technician in Packaging placed the wrong date code on a product and was not kept in a PIP.  Brown Aff. ¶ 49; Brown I Dep. at 49-52; Brown III Dep. at 38-39 (testifying about Ron Price).  Brown testified that other male employees had similar or more serious quality issues than she had and that they were not put into a PIP.  Brown Aff. ¶ 62; Brown I Dep. at 49-50, 53; Brown III Dep. at 39-

40.  Brown complained to Haverkamp about the differential treatment.  Brown Aff. ¶¶ 56, 58; Brown I Dep. at 150-51.

Sometime in 2001, Brown's co-workers viewed numerous sexual images on computers on the plant's lines.  Brown Aff. ¶¶ 71, 72.  One day, Kitchell and another male employee, Ron Singer, told Brown to come look at a picture and she saw a woman in a sexual position with a horse.  Brown Aff. ¶ 73; Brown III Dep. at 174.  Brown complained to Kitchell and Singer that she did not want to see the sexual images.  Brown Aff. ¶ 75.  Brown needed to use these same computers to do her job.  Brown III Dep. at 173-74.  While Brown testified in her affidavit that she witnessed members of Hill's management, such as area leaders Terry Abner and Everett Jenkins, looking at sexual images on computers, see Brown Aff. ¶ 76, she testified to the contrary in her depositions on more than one occasion.  See Brown I Dep. at 71, 85; Brown II Dep. at 79.

In the spring of 2002, Hill's management investigated a report of sexual images on workplace computers.  Brown Aff. ¶ 78.  As a result of the investigation, eleven employees were suspended for two weeks without pay, including Abner and Jenkins.  Zaleha Aff. ¶ 15; Brown Aff. ¶ 79.  Management then issued a statement to employees reminding them not to use workplace e-mail and computers for inappropriate purposes.  Zaleha Aff. ¶ 15; Brown Aff. Ex. 4.  Although Brown testified that the sexual images reappeared, see Brown Aff. ¶ 80, she offers no time frame for the incident.  In addition, Brown testified only about sexual images she

saw while working in Packaging and said that "corporate" had "cleaned up" the plant's computers of objectionable images by the time she transferred to Stretchwrap.  Brown I Dep. at 69; Brown II Dep. at 73.

In May 2002, Brown and her two young daughters were in a car accident. Brown Aff. ¶ 95.  Brown called Hill's immediately after the accident and reported that she was taking her daughters to the hospital.  Brown Aff. ¶ 96; Brown I Dep. at 65-66.  After her daughters were released from the hospital, Brown went to work for the second half of her shift.  Brown Aff. ¶ 97.  Brown requested Family Medical Leave ("FML") from the Human Resources office for the time she had missed, but that leave was denied.  Brown Aff. ¶ 98; Brown I Dep. at 67; Brown III Dep. at 188-89.  Brown previously had taken FML for about two months in 2000 for foot surgery and for six days in 2001 for outpatient surgery.  Brown Aff. ¶¶ 83, 84; Vanderpool Aff. ¶¶ 4, 5.

Brown appears to raise three issues with the way her FML was handled. First, she claims that her May 2002 absence should have counted as FML because Hill's allowed male employees to take FML in hourly increments to care for their children, and the plant policy stated that FML would be calculated in hourly increments.  Brown Aff. ¶¶ 99-101, Ex. 2; Brown I Dep. at 66 (testifying about Mark Toney's absence to care for stepson).

Second, on May 17, 2002, Brown was moved into the second stage (performance agreement) of the Individual Improvement Process ("IIP") because of her attendance issues. Brown Aff. ¶ 102; Brown I Dep. at 155. The IIP process had replaced the PIP process in 2002. See Brown Aff. Ex. 7. Brown's second-stage IIP noted that she had 76.5 hours of non-FML absences, but she claims that this number incorrectly incorporated FML absences. Brown Aff. ¶ 103. Brown's recorded non-FML absences of 76.5 hours represented a 3.3% absenteeism rate, while the plant's absenteeism norm was 1%. Vanderpool Aff. ¶¶ 6-7.

Third, Brown alleges that her FML absences were counted against her as "data points" in her personnel file and that, taken together with other data points, FML absences can result in extending discipline and not receiving an attendance bonus. Brown Aff. ¶¶ 85, 90-94, Exs. 27 & 28. Brown testified that, because her absences exceeded a certain threshold, Hill's cut her bonus in either 2002 or 2003. Brown III Dep. at 198-99.

In June 2002, Hill's discontinued use of the machine on which Brown worked in Packaging. She began serving as a "floater" in many different areas of the Plant. Brown Aff. ¶¶ 106, 120; Brown I Dep. at 19, 21. Brown testified that she previously had requested to move to Processing, but that the position was given to a male co-worker, Chris White. Brown Aff. ¶ 117; Brown I Dep. at 27-28. She complained about this to area leader Terry Abner. Brown I Dep. at 164. Brown also testified that she was told she could not apply to work on the new

machine in Packaging because of an attendance problem.  Brown Aff. ¶ 106; Brown I. Dep. at 37-39.  Brown claims, however, that a male employee with the same number of absences was given the position.  Brown Aff. ¶¶ 107, 116, Ex. 5; Brown I Dep. at 39-40; Brown III Dep. at 119 (testifying about Chuck McConnell).  She also alleges that McConnell and another male employee from her team were sent to Kentucky for training on the new machine, while she and a female employee from her team were not.  Brown Aff. ¶¶ 114, 115.

As a floater, Brown was required to work with Kitchell more than she did while in Packaging.  Brown Aff. ¶ 121.  Kitchell continued to make sexual statements and derogatory statements about technician Carol Isaacs every day that Brown worked with him.  Brown Aff. ¶ 124.  Brown told support technician Teresa Toney and area leader Abner that she did not want to work with Kitchell, but there is some dispute over the explanation she provided.  Brown Aff. ¶¶ 122, 123; Brown I Dep. at 81-83.

Brown moved into the Stretchwrap area of the Plant in or around September 2002.  Vanderpool Aff. ¶ 3; Brown Aff. ¶ 125; Brown I Dep. at 19.  While in Stretchwrap, Brown heard fellow technicians Ben Chasteen, Bill Pebworth, and Chris Penland say that Carol Isaacs should not be allowed to take FML and that it was not right that she was suing the company for sexual harassment.  Brown Aff. ¶ 136; Brown I Dep. at 97, 126-27.  The same men would make sexual references in Brown's presence and over the company radio by joking, for

example, that they were "dragging their wood." Brown I Dep. at 144-45. Pebworth also called Isaacs and women in general vulgar names, and he made statements about sex and engaged in other "gross, nasty talk" every day. Brown Aff. ¶¶ 137-139; Brown I Dep. at 88; Brown III Dep. at 173, 202. Brown alleges that she complained to Jenkins "about the sex discrimination and sexual harassment" but that Jenkins told her Pebworth had already been addressed. Brown Aff. ¶¶ 140, 166. Brown testified that she also talked with Jenkins "about . . . being in stretch wrap and all the stuff that was going on there." Brown I Dep. at 165.

During the time that Brown worked in Stretchwrap, fellow technician Carol Isaacs was on leave from Hill's and had made some complaints against the company. Brown's co-workers in Stretchwrap showed Brown a petition requesting that Isaacs not be placed back in Stretchwrap after she returned from leave. Brown Aff. ¶ 142; Brown III Dep. at 126-27. Brown refused to sign the petition because she supported Isaacs in her complaints. Brown Aff. ¶ 143. Jenkins said that if it were up to him, he would not let Isaacs return to work. Brown I Dep. at 113-17; Brown Aff. ¶ 152, Ex. 11. Brown also supported Isaacs in team meetings and said that Isaacs was correct for complaining about sexual harassment and that she should be able to take FML. Brown Aff. ¶ 167; Brown I Dep. at 169-70. After expressing support for Isaacs, Brown's teammates refused to help Brown or to speak to her the same way. Brown Aff. ¶¶ 168, 169; Brown I Dep. at 173-75; Brown III Dep. at 114.

On March 7, 2003, Brown injured her back at work and reported her injury to the plant. Brown Aff. ¶ 170, Ex. 13; Brown III Dep. at 163. Priscilla Elliott from Human Resources scheduled an appointment for Brown with the worker's compensation physician for March 13, 2003. Brown Aff. ¶ 171. Brown was approved for physical therapy and Haverkamp changed her shift to the day shift to accommodate her therapy. Brown Aff. ¶¶ 176, 177.

On the morning of Brown's April 3rd therapy appointment, Brown complained to Operations Manager Haverkamp that he had not yet found someone to fill her overtime for that day and that her worker's compensation had not yet been approved. Brown Aff. ¶ 183; Brown III Dep. at 15. Haverkamp told Brown that she might have to pay for the physical therapy herself or even borrow the money. Brown Aff. ¶ 186. Haverkamp then left the room and returned with Plant Manager Cathy Zaleha and Human Resources Manager Mike Keinath. Brown Aff. ¶ 188; Zaleha Aff. ¶ 18. Brown asked them to help get her physical therapy paid for by worker's compensation, but Haverkamp and Keinath told Brown that she was not doing her job and that she could go home, but that they would tell corporate she was refusing to do her job. Brown Aff. ¶ 189; Brown III Dep. at 26-29. They also told her that she could not call the doctor's office because she had exceeded her break time for the day, which Brown says was not true. Brown Aff. ¶ 191. Brown claims that Haverkamp and Keinath "harassed" her for two hours until she was to the point of crying. Brown Aff. ¶ 193; Brown III Dep. at 31. Brown was told before she left Hill's that she had been approved for worker's

compensation and she scheduled a paid therapy appointment for the next day. Brown Aff. ¶ 195; Brown III Dep. at 152.  Brown was not disciplined for these events, but her absence caused her to lose her overtime rate of pay that week. Brown III Dep. at 31-33; Zaleha Aff. ¶ 19.  Brown later complained to Jenkins about Haverkamp's treatment of her.  Brown Aff. ¶ 200.  Brown also alleges that Haverkamp did not treat men who had worker's compensation claims like he treated her.  Brown Aff. ¶ 211.

Brown left the plant, went home, and called the Colgate hotline.  See Brown Aff. ¶ 196, Ex. 14.  Abbie Dillard, a hotline representative, returned Brown's call. Brown testified that she discussed with Dillard the worker's compensation episode and Haverkamp's treatment of her.   Brown I Dep. at 160-61.   Brown more specifically testified that she told Dillard "what had happened that day," that Haverkamp "had a problem with women," and that she "felt that Haverkamp was treating me] that way because of my support of Carol."  Brown III Dep. at 35, 37, 136, 180; see also Brown Aff. Ex. 16 (Dillard's notes from conversation).  Brown testified generally that she "complained to the Colgate hotline about the sexual harassment, the discrimination against women, and [her] support of Carol Isaacs." Brown Aff. ¶ 196.  Dillard told Brown not to report to work until she had heard back from her.  Brown Aff. ¶ 197.  Dillard called back later that evening and told Brown to report for work, which she did.  Brown Aff. ¶ 198.  Brown later called Dillard several more times to complain, but Dillard did not return her calls. Brown Aff. ¶ 199; Brown III Dep. at 35-37.

About two weeks prior, on March 18, 2003, Brown had been involved in a fork truck accident at work.  Brown had tried to maneuver a fork truck through a narrow pathway and accidentally had hit a stairway with the forks.  Brown III Dep. at 190, Ex. 10.   On April 8th, about five days after her worker's compensation episode, an Incident Investigation Team issued a memo recommending that Brown be re-certified in fork truck operation.  See Brown Aff. Ex. 18.  No changes were made to Brown's IIP because of her accident.  Brown III Dep. at 190-91; Zaleha Aff. ¶ 16.  However, Brown alleges that hitting stairs with forks was not uncommon, that male employees were not written up for it, and that employees were not written up weeks later for forklift problems.  She also claims that she had forklift accidents prior to complaining to the hotline and was not written up for them.   Brown Aff. ¶ 205.   On the same day, the Incident Investigation Team also issued a memo reporting on the cause of Brown's March 7th injury.  See Brown Aff. Ex. 17.  The team concluded that the plant's transfer car system had not worked properly.

Brown testified that, around late April or early May 2003, Haverkamp and Keinath often came to the Stretchwrap area where she worked and glared at her.  Brown Aff. ¶ 201; Brown III Dep. at 192-96.  Brown claims that she was so afraid of Haverkamp and the other managers, she did not feel comfortable going to the plant to get her paycheck and therefore sent her mother to get it.  Brown Aff. ¶ 203, Ex. 15.

Brown enrolled in a full-time nursing program and began classes in May 2003.  Brown I Dep. at 16.  Around that same time, she began working fifteen hours per week at a department store.  Brown III Dep. at 63.  Brown testified that it was her intention to attend nursing school and to continue working her set night shift at Hill's.  Brown Aff. ¶ 230; Brown I Dep. at 59; Brown II Dep. at 8. Brown's last day of actual work at Hill's Richmond plant was May 12, 2003. Brown Aff. ¶ 217; Zaleha Aff. ¶ 20.  Brown took sick and vacation leave from Hill's for most of her scheduled shifts in May.  Brown III Dep. at 69-70, 77-79.  At some point in late May or early June, Brown decided that she "just couldn't take it any more" at Hill's.  Brown I Dep. at 60-61.  She testified that the thought of going back to work made her "sick" because of her teammates' treatment of Carol Isaacs and their treatment of her for defending Isaacs.  Brown I Dep. at 61-62; Brown III Dep. at 73, 88-90.  Brown called Everett Jenkins in early June to notify him that she was not coming back to work.  Brown Aff. ¶ 220; Brown I Dep. at 60.

On June 27, 2003, after her employment with Hill's had ended, Brown sent a letter to Mike Keinath at the Richmond plant stating that she had been harassed and intimidated because of her gender, her support for Isaacs, and because she had a worker's compensation injury.  Brown Aff. ¶ 221, Ex. 19.  She also made some complaints in July when Hill's worker's compensation provider stopped paying for her physical therapy.  See Brown Aff. ¶¶ 223-29, Exs. 22 & 23.  On or

about August 21, 2003, Brown filed an EEOC charge against Colgate-Palmolive. Brown I Dep. at 179; Brown III Dep. at 82, Ex. 3.[2]

*Discussion*

I.   *Colgate-Palmolive*

Colgate-Palmolive is not a proper defendant in this case. The undisputed evidence shows that it was not Brown's employer and did not the direct the acts of which she complains. There are three ways in which Colgate could be found to be a proper Title VII defendant: (1) if Brown could present evidence that Colgate maintained an employment relationship with her; (2) if Brown could pierce the corporate veil and present evidence that the Hill's subsidiary is only an alter ego of the parent Colgate; or (3) if Brown could present evidence that Colgate took actions to avoid liability under the discrimination laws or might have directed the discriminatory act, practice, or policy of which she complains. *Worth v. Tyer*, 276 F.3d 249, 259-61 (7th Cir. 2001).

---

[2]Hill's points out that it was not named as a party in Brown's EEOC charge, but that only Colgate-Palmolive was named. Generally, a party not named in an EEOC charge may not be sued under Title VII. However, "where an unnamed party has been provided with adequate notice of the charge, under circumstances where the party has been given the opportunity to participate in conciliation proceedings aimed at voluntary compliance, the charge is sufficient to confer jurisdiction over that party." *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130*, 657 F.2d 890, 905 (7th Cir. 1981); see also *Schnellbaecher v. Baskin Clothing Co.*, 887 F.2d 124, 126 (7th Cir. 1989). As a subsidiary company of the party named in the EEOC charge, and as Brown's real employer, these conditions are likely met here. Hill's may not avoid Brown's charges merely by identifying her procedural mistake without some showing of prejudice.

In *Worth v. Tyer*, the Seventh Circuit looked to the five factors of the "economic realities test" to determine whether an alleged victim of sexual harassment was an employee of the defendant and thus had a right to sue under Title VII:  (1) the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work; (2) the type of job skills required to carry out the work and whether the skills are learned in the workplace; (3) the responsibility for cost of the operation (*i.e.*, who pays for equipment, supplies, fees, licenses, workplace, and maintenance of operations); (4) the method and form of payment and benefits; and (5) the length of the job commitment and/or expectations.  276 F.3d at 263, citing *Knight v. United Farm Bureau Mutual Ins. Co.*, 950 F.2d 377, 378-79 (7th Cir. 1991).   Of these five factors, the most important is the right to control and direct the worker's actions. *Id.*; accord, *Alexander v. Rush North Shore Medical Center*, 101 F.3d 487, 492-93 (7th Cir. 1996).

Brown alleges that from the time that she and other employees were hired at Hill's Richmond Plant, they were told that they were Colgate employees, that they needed to follow Colgate instructions, and that they should direct employment complaints to the Colgate hotline because "Colgate would investigate and take action for us."  Brown Aff. ¶ 7 (also incorporating co-worker affidavit and deposition testimony).  Brown also alleges that part of the compensation for Hill's technicians took the form of Colgate preferred stock.  *Id.*

Despite Brown's own characterization of her employment situation, she has produced no evidence of objective control of Hill's employees by Colgate. Hill's employees received their salaries and benefits from Hill's, even though Colgate determined some employee benefits. Although Hill's employees were obliged to follow Colgate's Code of Conduct, Hill's managers controlled the discipline, scheduling, and assignment of work for the employees in its Richmond Plant.

With respect to Brown specifically, the evidence shows that a Colgate hotline representative received Brown's complaint on April 3rd, but there is no evidence indicating that Colgate advised Hill's management on how to handle the situation. There is also no evidence that Hill's management did not make the ultimate decisions about her discipline. See Vanderpool Aff. ¶¶ 8-10; Zaleha Aff. ¶¶ 21-23. None of Brown's citations to the record raise an issue of material fact as to whether Colgate controlled any of the decisions relevant to this case, such as her work, her discipline, or the handling of her FMLA and worker's compensation claims.

Brown has not provided factual evidence tending to show that she was an employee of Colgate. Brown also has not provided any evidence to pierce the corporate veil or to implicate Colgate in the alleged discriminatory actions. Colgate-Palmolive's motion for summary judgment is granted, and Colgate-Palmolive must be dismissed as a defendant.

II.    *Title VII Sex Discrimination Claim*

Brown claims that Hill's discriminated against her on the basis of her sex in a variety of ways.  Title VII makes it unlawful to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, *terms, conditions, or privileges of employment*, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1) (emphasis added).  One way in which an employer can discriminate with respect to terms and conditions of employment is by subjecting an employee to a hostile work environment based on her sex.  Title VII prohibits an employer from "requiring people to work in a discriminatorily hostile or abusive environment."  *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 975 (7th Cir. 2004), quoting *Shanoff v. Illinois Dep't of Human Services*, 258 F.3d 696, 701 (7th Cir. 2001), quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).  An employer can also discriminate with respect to terms and conditions of employment by subjecting an employee to an adverse employment action because of her sex.  *Wyninger*, 361 F.3d at 978.

A.    *Time-Barred Incidents*

Hill's argues that claims based on events that took place prior to October 24, 2002, should be dismissed as time-barred because they occurred outside of the 300-day window before Brown filed her EEOC charge on August 21, 2003.  With respect to Brown's hostile environment claim, this argument is not

persuasive.  The Supreme Court explained in *National Railroad Passenger Corp. v. Morgan*:  "It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period.  Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."  536 U.S. 101, 117 (2002); see also *Hildebrandt v. Illinois Dep't of Natural Resources*, 347 F.3d 1014, 1032 (7th Cir. 2003).

Viewing the evidence in the light reasonably most favorable to Brown, she has identified acts that a reasonable jury could conclude contributed to her hostile environment claim and occurred within the limitations period – namely, the frequent use of offensive language by male co-workers such as Ben Chasteen, Bill Pebworth, and Chris Penland in the Stretchwrap area of the plant during late 2002 and early 2003.  Brown also has offered evidence suggesting that these acts were part of a single hostile environment because they were similar or related to other acts implicating other employees in various areas of the plant.  See Brown I Dep. at 144-45 (hearing offensive language over the radio), Brown I Dep. at 70 (visiting other plant areas while serving as quality point person for Packaging), Brown III Dep. at 196 (being required to go to different areas when assigned to Stretchwrap), Brown I Dep. at 78-79 (hearing comments by Kitchell in break room and at times other than when Brown worked directly with him).  As approved by *Morgan*, the court will consider conduct prior to October 24, 2002 that was part

of the same alleged hostile work environment, including the use of similar offensive language by Tom Kitchell and others while Brown worked in Packaging or as a floater.

Brown's general complaints about gender disparities in day-to-day assigned tasks and training also are not time-barred.  See *Morgan*, 536 U.S. at 115 (similar to hostile environment claims, "[t]heir very nature involves repeated conduct."). Brown essentially argues that Hill's maintained a system over the course of her employment that allowed male technicians to take advantage of specialized training and to assign undesirable tasks to their female co-workers.  She does not challenge any one-time adoption of an official discriminatory policy.  Like the allegations supporting her hostile environment claim, Brown's general complaints about disparities in training and assignments are not time-barred.  See, *e.g.*, *Hildebrandt*, 347 F.3d at 1035-36 (considering plaintiff's general allegations of unequal treatment as part of single hostile environment).

On the other hand, *Morgan* held that any discrete acts of discrimination (not part of a hostile environment claim) that fall outside the 300-day statute of limitations period are time-barred even if they relate to other discrete acts that fall within the limitations period.  536 U.S. at 111-13.  The Court gave specific examples of discrete acts:  termination, failure to promote, denial of transfer, and refusal to hire.  *Id.* at 114; see also *Lucas v. Chicago Transit Authority*, 367 F.3d 714, 724 (7th Cir. 2004).

Some discrete events relied upon by Brown to support her Title VII claim must be considered time-barred. First, Brown's 2001 PIP for her date coding problem is a discrete act that fell outside of the 300-day window. Brown's PIP was intended to last from July 2001, which was outside of the limitations period, until July 2002, which also fell outside of the limitations period. On May 17, 2002, Brown was moved into the second stage of the disciplinary process (now called IIP) for attendance issues. Her performance agreement expired on May 17, 2003, which fell within the 300-day limitations period. See Brown Aff. Ex. 7; Brown III Dep. at 80.

Even though Brown's 2001 PIP was ultimately extended to 2003, Hill's initial decision to discipline Brown for the date coding issue was a discrete discriminatory act that occurred outside the relevant limitations period. It does not matter that the effects of the decision may have been felt within the limitations period. See *United Air Lines v. Evans*, 431 U.S. 553, 558 (1977) (employee's separation prior to limitations period because of alleged discriminatory policy did not support claim for continuing violation where employee was rehired and lost seniority credit as a result), cited by *Morgan*, 536 U.S. at 112, and *Reese v. Ice Cream Specialties, Inc.*, 347 F.3d 1007, 1011 (7th Cir. 2003). In addition, Brown has failed to come forward with specific evidence showing that any specific adverse effects occurred within the limitations period. See Brown Aff. ¶ 55 ("As a result of being put in PIPs, we lost parts of our quarterly and yearly bonuses.").

Similarly, to the extent that Brown's discipline in May 2002 forms part of her Title VII claim, this event is also time-barred.  Brown alleges that she was not permitted to take FML in hourly increments to care for her children but that men like Mark Toney were allowed to do so.  Brown contends that as a direct result of not being allowed to count her half-day absence as FML, she was moved into the second stage of IIP for absenteeism.  Brown also contends that she was not put into formal coaching before she was moved into the second stage of her IIP, but that male employees generally were.

Here again, the fact that Brown's IIP was to last until May 2003, within the relevant limitations period, does not make Hill's initial disciplinary decision itself actionable.  The undisputed evidence shows that *placement* into Hill's PIP/IIP process (the act of which Brown complains) involved a one-time determination, even if the effects of that decision were felt in the future.  With this understanding of the PIP/IIP process, the court concludes that challenges to an employee's placement in the PIP/IIP process must be measured from the date of discipline. The court acknowledges that this conclusion represents a change in view from that reached in an earlier case involving similar facts.  See *Bright v. Colgate-Palmolive Co.*, 2005 WL 1799440, *12 n.7 (S.D. Ind. July 26, 2005) (concluding that plaintiff's PIP/IIP did not constitute a discrete act under *Morgan*).  Hill's handling of Brown's request for FML in May 2002, and its related placement of Brown into a second-stage IIP in May 2002, are discrete events that cannot form part of her Title VII claim.

Finally, Brown's complaints relating to her move out of Packaging to a floater position in June 2002 are also time-barred as discrete discriminatory events outside of the 300-day limitations period.  Brown alleges that she requested a position in Processing, which was given to a male co-worker, and that a similarly situated male employee was allowed to continue working in Packaging on the new machine.  These events occurred several months before October 24, 2002 and are therefore time-barred.  See *Morgan*, 536 U.S. at 114 (characterizing "denial of transfer" as an easily identifiable discrete act).  Brown may not rely on Hill's refusal to transfer her to Processing, or its refusal to keep her in Packaging, as a basis for her Title VII claim.[3]

B.     *Hostile Work Environment*

To survive summary judgment on her hostile work environment claim, Brown must come forward with evidence that would allow a reasonable fact finder to conclude that:   (1) she was subject to unwelcome harassment; (2) the harassment was based on her sex; (3) the harassment was sufficiently severe or pervasive so as to alter the conditions of her employment and to create a hostile or abusive working environment; and (4) there is a basis for employer liability. *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004) (hostile work

---

[3]Brown spends a great deal of effort arguing that her move to Stretchwrap "in or around September 2002" falls within the relevant limitations period, but she has not alleged that any aspect of this transfer was itself discriminatory.  Rather, Brown's only discernible complaint is that her 2002 transfer was an inadequate response by Hill's to the harassment and discrimination she claims to have experienced in Packaging and as a floater.

environment claim based on sexual harassment); *McPherson v. City of Waukegan*, 379 F.3d 430, 437-38 (7th Cir. 2004) (same).

Only two experiences are relevant to Brown's hostile environment claim. First, she was exposed to sexual images on company computers. Second, she was subjected to derogatory language about females on a daily basis. Generally speaking, being forced to view sexual images on workplace computers and tolerate offensive language by male co-workers could constitute harassment based on sex. In Brown's case, however, the evidence shows that she was not the target of such behavior, but rather that the offending individuals acted similarly in all situations and toward all Hill's employees. See, *e.g.*, Brown III Dep. at 108-09. It is not clear, therefore, that Brown would satisfy the initial requirement that she suffered harassment based on her sex. See *Hildebrandt*, 347 F.3d at 1034 (harassment must have occurred because of the sex of the complainant); *Holman v. Indiana*, 211 F.3d 399, 403-07 (7th Cir. 2000) (affirming dismissal of Title VII harassment claim where offending party was an "equal opportunity" harasser).

Even assuming this requirement is satisfied, Brown must show that she suffered harassment that was either severe or pervasive. To be considered severe or pervasive, the conduct must have been objectively hostile or abusive, and the target also must have subjectively perceived it that way. *Harris*, 510 U.S. at 21-22. In deciding whether conduct is objectively hostile or abusive, the court must consider all of the circumstances, including the frequency of the discriminatory

conduct; the severity of the conduct; whether the conduct was physically threatening and/or humiliating, or merely an offensive utterance; and whether the conduct unreasonably interfered with the plaintiff's work performance.    See *McPherson*, 379 F.3d at 438; *Wyninger*, 361 F.3d at 975-76.    The boundary between actionable harassment and less severe conduct is not a bright one, and federal courts have struggled with the standard case by case:

> Drawing the line is not always easy. On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers.

*Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 807 (7th Cir. 2000) (internal citations omitted).

A fact-finder could conclude that Brown subjectively perceived her work environment to be hostile and abusive.  See, *e.g.*, Brown III Dep. at 173 ("I think I've been sexually harassed in having to listen to that and seeing the pornography on the computers.").  With respect to Brown's complaints about her co-workers' language, however, the evidence could not support a finding that this conduct was sufficiently severe or pervasive to support a claim under Title VII.  A hostile work environment claim requires proof that goes beyond evidence of an uncomfortable or unpleasant work environment.  See *Wyninger*, 361 F.3d at 977.  Title VII is not a "'general civility code' designed to purge the workplace of all boorish or even all

harassing conduct." *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 808 (7th Cir. 2001), citing *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998).

In considering the factors outlined above, the only factor weighing in Brown's favor is frequency. Brown testified that Pebworth and Kitchell used vulgar language and made derogatory and offensive remarks about Isaacs and women generally "every day." However, Brown also testified that *none* of these comments were made about her, and most were not even directed at her. See Brown III Dep. at 108-09, 202-03. Brown has presented no evidence that the conduct was physically threatening or objectively humiliating, or that it interfered with her work performance.

The court recognizes that "pervasiveness and severity 'are, to a certain degree, inversely related; a sufficiently severe episode may occur as rarely as once, while a relentless pattern of lesser harassment that extends over a long period of time also violates the statute.'" See *Cerros v. Steel Technologies, Inc.*, 398 F.3d 944, 951 (7th Cir. 2005), citing *Cerros*, 288 F.3d at 1047 (internal citation omitted). However, Brown has not pointed to any case law holding that a plaintiff's environment is objectively hostile when the "relentless pattern" involves no more than sexual comments made by males in the presence of others, including the female plaintiff, where those comments are not directed at or about the plaintiff. Cf. *Cerros*, 288 F.3d at 1046-47 (direct and highly offensive racial epithets toward plaintiff by employees and supervisors, in addition to racial graffiti

and slashed car tires, could amount to hostile environment); *Shanoff*, 258 F.3d at 704-05 (in the context of supervisor comments to "bully, intimidate, and insult" employee about his race and religion: "repeated incidents of verbal harassment that continue despite the employee's objections are indicative of a hostile environment").

While the court does not condone the behavior of Brown's male co-workers, no reasonable jury could conclude that their behavior made Brown's work environment objectively hostile or abusive within the meaning of Title VII. See *Moser v. Indiana Dep't of Correction*, 406 F.3d 895, 902-03 (7th Cir. 2005) (affirming summary judgment on Title VII hostile environment claim in favor of employer where plaintiff had alleged that co-worker's harassing remarks were "part of his daily, non-ceasing quest to degrade women" but court found no serious or threatening comments); *Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675, 678 (7th Cir. 2005) (affirming summary judgment on Title VII hostile environment claim in favor of employer where co-workers' behavior was "more reflective of run of the mill uncouth behavior than an atmosphere permeated with discriminatory ridicule and insult"); *Hildebrandt*, 347 F.3d at 1034-35 (noting that comments overheard by, but not directed at, the plaintiff do not have the same impact as harassment directed at her).

Pervasive sexual and pornographic images in the workplace can create an actionable hostile environment. See, *e.g.*, *Hostetler*, 218 F.3d at 807 (categorizing

pornographic pictures as conduct identifiable with a hostile work environment). To survive summary judgment on her sexual harassment claim, however, Brown also must show that Hill's was negligent in failing to discover the harassment or in its efforts to prevent further harassment. See *Mason v. Southern Illinois Univ. at Carbondale*, 233 F.3d 1036, 1043 (7th Cir. 2000); *Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027, 1035 (7th Cir. 1998). In hostile workplace cases, "the employer can avoid liability for its employees' harassment if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1048 (7th Cir. 2000).[4]

_____

[4]An employer's liability for hostile environment sexual harassment depends on whether the harasser is the victim's supervisor or merely a co-employee. An employer is subject to vicarious liability for an actionable hostile environment created by a supervisor with immediate (or higher) authority over the employee. *Parkins*, 163 F.3d at 1032. But an individual is not a supervisor unless he or she possesses the authority to directly affect the terms and conditions of the plaintiff's employment: *i.e.*, the power to hire, fire, demote, promote, transfer, or discipline the plaintiff. See *Rhodes*, 359 F.3d at 506 (no Title VII supervisory authority where alleged harassers managed plaintiff's work assignments, investigated her complaints, and made recommendations concerning sanctions for rules violations, but had no authority to make decisions affecting the conditions of her employment); *Hall v. Bodine Electric Co.*, 276 F.3d 345, 355 (7th Cir. 2002) (no Title VII supervisory authority where alleged harasser directed plaintiff's work operations, provided input into her performance evaluations, and was charged with training her and other less experienced co-workers, but had no decisionmaking authority to affect the conditions of her employment). As in *Rhodes* and *Hall*, Brown has presented no evidence that technicians at Hill's had Title VII supervisory authority. Accordingly, Hill's liability for the purported harassment of Brown by her fellow technicians must be determined according to the standard for co-employees.

Brown argues that Hill's should be vicariously liable for harassment resulting from Hill's management viewing sexual images on plant computers. See Pl. Resp. Br. at 43; Brown Aff. ¶ 76 ("I saw members of management, such as Area
(continued...)

The undisputed evidence shows that Hill's knew about the problem of sexual images on computers in the spring of 2002, conducted an investigation, suspended eleven employees, and then issued a memorandum warning employees about inappropriate use of workplace e-mail and computer systems. Zaleha Aff. ¶ 15; Brown Aff. Ex. 4. Brown argues that she has created a genuine issue of fact about the effectiveness of Hill's investigation because she testified that "more males should have been disciplined or terminated, and the pornography reappeared." Brown Aff. ¶ 80. Brown also argues that Hill's should be precluded from relying on its investigation because it has refused to present documents related to its investigation based on irrelevance, attorney-client privilege, and work product doctrine. See Brown Aff. ¶ 82, Exs. 34 & 35 (Interrogatory No. 25).

As to her first argument, Brown has not created a genuine issue of fact that Hill's investigation was in any way deficient. Brown claims that objectionable images reappeared after Hill's 2002 investigation. But her deposition testimony makes clear that any knowledge she has about sexual images reappearing at Hill's is second-hand and relates to a time after she no longer worked there. See Brown

_____

[4](...continued)
Leader Terry Abner and Area Leader Everett Jenkins, looking at the sexual pictures . . . ."). However, Brown's testimony in her affidavit is directly contradicted by her earlier deposition testimony, without explanation, and is therefore insufficient to create a genuine issue of fact that this occurred. See Brown I Dep. at 71 (Q: "Did you see Everett Jenkins looking at anything?" A: "No."), at 85 (Q: "Did you see any member of management with any pornographic pictures?" A: "No."); Brown II Dep. at 79 (Q: "Did you ever observe either Terry Abner or Everett Jenkins having porn themselves?" A: "No."). See Ineichen v. Ameritech, 410 F.3d 956, 963 (7th Cir. 2005) (parties may not create sham issues of fact with affidavits contradicting prior deposition testimony).

III Dep. at 205-06.   Brown's general testimony from her affidavit that "pornography reappeared" does not mention a time, and even when viewed in the light most favorable to Brown, cannot create a genuine issue of fact about the effectiveness of Hill's response.

As for Brown's second argument, Zaleha's affidavit about Hill's investigation and subsequent discipline of its employees cited specific concrete facts and was based on personal knowledge.   The affidavit is admissible without supporting documentation and is sufficient to meet Hill's burden to establish that it took prompt and appropriate corrective action once it had notice of the problem. Although an employer may not be entitled to rely only on the mere fact that an investigation occurred to prove that its investigation was adequate, the proof here is in the pudding.   Brown offers no admissible evidence that she saw sexual images or was present where others viewed sexual images following Hill's investigation and disciplinary measures in 2002.

No reasonable jury could conclude that the offensive language of which Brown complains made her work environment objectively hostile and abusive.  In addition, Brown has offered no evidence that Hill's responded deficiently to the presence of sexual images on workplace computers.  Accordingly, Brown's sexual harassment claim fails as a matter of law.

C.     *Sex Discrimination – Disparate Treatment*

Brown offers no direct evidence of discriminatory intent on the part of Hill's. To establish a prima facie case of sex discrimination under the indirect method of proof, Brown must show:  (1) she was a member of a protected class; (2) she was meeting her employer's legitimate performance expectations; (3) she was subjected to an adverse employment action; and (4) she was treated less favorably than similarly situated male employees.  *Rhodes*, 359 F.3d at 504; *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002).  If Brown can establish a prima facie case, Hill's must articulate a legitimate, non-discriminatory reason for its actions, and Brown must then respond by showing that Hill's reason is really a pretext for discrimination.  *Rhodes*, 359 F.3d at 504.

The following evidence is relevant to Brown's allegations of sex discrimination under Title VII.  According to Brown, female technicians were assigned cleaning tasks whereas male technicians generally were assigned the easier and more favorable preventive maintenance tasks.  Only male technicians were trained in certain tasks.  Brown was "written up" after her 2003 fork truck accident while males were not "written up" for similar accidents.  Male technicians also were not "written up" for worker's compensation injuries, and managers like Haverkamp did not treat male employees who had worker's compensation claims the way in which Brown was treated.

Hill's argues that none of Brown's complaints constitute materially adverse employment actions under Title VII.  "A materially adverse employment action is something 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'"  *Rhodes*, 359 F.3d at 504, quoting *Crady v. Liberty Nat'l Bank and Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir. 1993).  A materially adverse action can be indicated by termination of employment, demotion, a less distinguished title, material loss of benefits, significantly diminished responsibilities, or other indices unique to a particular situation.  *Hildebrandt*, 347 F.3d at 1033 n.13, citing *Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002).  Not everything that makes an employee unhappy qualifies as a materially adverse action, and adverse employment actions are typically economic injuries.  *Whittaker v. Northern Illinois Univ.*, 424 F.3d 640, 647 (7th Cir. 2005).

Brown's complaints about disparities in training and work assignments are generally vague and do not rise to the level of adverse employment actions under Title VII.  Technician compensation and benefits did not vary by area or work assignment, and technicians were expected to (and did) work in all areas of the plant.  See *Rhodes*, 359 F.3d at 505 (affirming summary judgment on finding of no materially adverse employment action under Title VII where plaintiff complained of assignments and tasks consistent with the job duties of her position); *O'Neal v. City of Chicago*, 392 F.3d 909, 913 (7th Cir. 2004) (lateral transfer resulting in assignment of responsibilities that were within the reasonable scope of plaintiff's duties did not constitute an adverse employment action under

Title VII); *Crady*, 993 F.2d at 135-36 (lateral transfer to position with same salary, benefits, and level of responsibility did not constitute materially adverse employment action under Title VII). Brown testified that she did not apply for any posted positions within the plant. Brown III Dep. at 118. Brown's subjective preference to perform some, but not other, technician tasks does not establish an adverse employment action under Title VII. See, *e.g.*, *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (plaintiff must show some change in the terms or conditions of employment that is more than a "mere subjective preference"). Further, Brown testified that she never expressed her preferences to perform other tasks while in Packaging or Stretchwrap. See Brown I Dep. at 45; Brown II Dep. at 38.

Second, to demonstrate a discriminatory failure to train, Brown must show that (1) she is a member of a protected class; (2) her employer provided training; (3) she was eligible for training; and (4) she was not provided training under circumstances giving rise to an inference of discrimination, *i.e.*, similarly situated male employees were given such training. See *Malacara v. City of Madison*, 224 F.3d 727, 729 (7th Cir. 2000). Brown complains that she was denied training in preventive maintenance, but this complaint appears to be no more than a recast of her complaint about the assignment of tasks. Brown acknowledges that Hill's did not provide formal training in preventive maintenance. Brown I Dep. at 42-43. Brown also complains that she was denied computer training and training on the new line in Packaging. However, Brown admits that she did not request

such training or apply through the company's interview process.  Brown I Dep. at 35-37.  Further, Brown has presented no evidence that any disparities in training affected her opportunities for advancement with the company or had any other tangible negative impact on her employment as a technician.  Brown essentially disagrees with Hill's system of on-the-job training, even though all technicians were subject to such a system.  See, *e.g.*, Brown I Dep. at 41; Brown III Dep. at 124-25.  In sum, Brown's general complaints about assignments and training did not alter the terms and conditions of her employment within the meaning of Title VII.  See *West v. Maxon Corp.*, 2001 WL 1712511, *3 (S.D. Ind. Dec. 10, 2001) (female plaintiff's complaints, among others, that she had to teach herself certain skills and perform the "hard" jobs when she worked with men were "clearly not the type of things Congress contemplated as adverse employment actions").

Brown's other complaints of discrimination also do not rise to the level of materially adverse employment actions.  Brown has identified no tangible job consequences stemming from the two incident investigation reports that were completed in connection with her March 7th worker's compensation injury and her March 18th fork truck accident.  Even assuming these reports could be characterized as written reprimands, a written reprimand generally is not considered an adverse employment action unless it carries with it a concrete effect on an employee's position, pay, benefits, or prospects with the employer.  See *Walker v. Mueller Indus., Inc.*, 408 F.3d 328, 332 (7th Cir. 2005); *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 300 n.1 (7th Cir. 2004) ("a negative

performance evaluation is usually not labeled an adverse employment action");
*Smart v. Ball State Univ.*, 89 F.3d 437, 442 (7th Cir. 1996) (same).

Brown argues that incident reports can result in an employee being disciplined by being placed in an IIP. Brown points to the testimony of Krista Doyle, a team leader at Hill's, who stated that another female technician was placed in an IIP for a "recordable instance" because the incident investigation team concluded that she had exhibited unsafe behavior. See Doyle Dep. at 168 (Pl. Ex. S). Brown has presented no evidence that she experienced similar consequences. Actions that do not carry immediate consequences for an employee's terms or conditions of employment, and where no tangible economic effect is ever realized, cannot constitute materially adverse employment actions under Title VII. See *Whittaker*, 424 F.3d at 647-48 (unserved three-day suspension without pay, negative evaluation, written warnings, and placement on "proof status" resulting in no tangible job consequences were not adverse employment actions under Title VII); see also *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 729 (7th Cir. 2001) ("unfair reprimands or negative performance evaluations, unaccompanied by some tangible job consequence, do not constitute adverse employment actions"); *Rhodes*, 359 F.3d at 505 (counting last day of work as absence without pay allegedly contrary to company policy was not materially adverse employment action because it had only a "negligible impact" on income and did not cause material harm).

Moreover, Brown offers no specific information about those similarly situated male employees who she alleges did not receive "write-ups" for accidents or worker's compensation injuries. Similarly, Brown has not identified male employees who were treated better as to any aspect of their worker's compensation claims or injuries. Brown's conclusory allegations in her affidavit are insufficient to create a genuine issue of fact on her claims of discrimination. See, *e.g.*, *Hildebrandt*, 347 F.3d at 1035-36 (general allegations of unequal treatment without specific facts are insufficient to oppose motion for summary judgment). Brown is unable to make out a prima facie case of sex discrimination with respect to any of her complaints against Hill's.

III.    *Title VII and FMLA Retaliation Claims*

Title VII also prohibits employers from punishing employees for complaining about discrimination or other practices that violate Title VII. 42 U.S.C. § 2000e-3(a); *Moser v. Indiana Dep't of Corrections*, 406 F.3d 895, 903 (7th Cir. 2005). Similarly, the FMLA prohibits employers from discriminating or retaliating against employees who exercise their rights under the Act, and from interfering with an employee's attempt to exercise those rights. 29 U.S.C. § 2615(a); *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004).

The Seventh Circuit uses the same standard to evaluate Title VII and FMLA retaliation claims. *Buie*, 366 F.3d at 503. Under the direct method of proof, Brown must present direct evidence of (1) a statutorily protected activity; (2) an

adverse action taken by Hill's; and (3) a causal connection between the two. *Rhodes*, 359 F.3d at 508; *Stone v. City of Indianapolis Public Utilities Division*, 281 F.3d 640, 644 (7th Cir. 2002).  Under the indirect method, Brown must show that (1) she engaged in statutorily protected activity; (2) she performed her job according to Hill's legitimate expectations; (3) despite her satisfactory performance, she suffered an adverse action by Hill's; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity.  *Id.*  If Brown could establish a prima facie case under the indirect method, the burden would then shift to Hill's to articulate a legitimate, non-discriminatory reason for its actions.  If Hill's could do so, the burden then would shift back to Brown to present evidence that could allow a reasonable jury to find that Hill's stated reason was not a true reason, but a pretext, which might allow an inference of retaliatory intent.  *Id.*

No reasonable fact-finder could conclude from the evidence that Hill's retaliated against Brown for exercising her Title VII and/or FMLA rights.  First of all, Brown does not identify which actions by Hill's she believes are retaliatory. The court has considered some events that Brown arguably complains are linked to the exercise of statutorily protected rights.  Brown claims that Hill's retaliated against her by "harassing" her about her worker's compensation injury, by having Keinath and Haverkamp follow her around in Stretchwrap, and by writing her up for her fork truck accident and worker's compensation injury.  She also claims

that she experienced retaliation from her Stretchwrap teammates who refused to help her or talk to her because she supported Carol Isaacs.

There is evidence that Brown engaged in statutorily protected activities. Brown claims that Hill's retaliated against her for standing up for Carol Isaacs (who Brown alleges had exercised protected rights under Title VII and the FMLA). She also claims that Hill's retaliated against her for complaining to management and for calling the Colgate hotline about sexual harassment and discrimination. If true, these would constitute protected activities. Brown also alleges that Hill's retaliated against her for filing a worker's compensation claim, but she cannot assert this theory under Title VII or the FMLA because filing a worker's compensation claim is not a protected activity under either Act. This allegation is discussed below in relation to her state law claim.[5]

Hill's argues that none of Brown's complaints rise to the level of a material adverse employment action. First, Brown's allegations regarding the actions of her

---

[5]Hill's contends that Brown's affidavit testimony conflicts with her earlier deposition testimony concerning whether she raised the issues of sexual harassment and sex discrimination in her call to the Colgate hotline, or whether she discussed only her frustration with Haverkamp and his handling of her worker's compensation on one day. See, *e.g.*, Brown I Dep. at 160-61; Brown III Dep. at 35, 37, 136, 180. But Brown was asked in her deposition if she talked with Dillard about events other than the events of April 3rd and she testified: "I can't recall if I did or not. I was just so upset after we talked." Brown I Dep. at 161. Construed in the light reasonably most favorable to Brown, Brown's deposition testimony can be interpreted to avoid contradiction with her affidavit. Brown has identified a genuine issue of fact as to whether her conversation with Dillard put Hill's on notice about her complaints of sexual harassment and sex discrimination.

co-workers cannot form the basis of her retaliation claim.  See *Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027, 1039 (7th Cir. 1998) (shunning by co-workers does not amount to materially adverse employment action unless employer orders the behavior and it results in material harm to the plaintiff).  Brown claims that her Stretchwrap teammates did not talk to her or help her in the same way after she expressed support for Isaacs.  Not only does this behavior not implicate Hill's management, Brown has presented no evidence that it interfered with the performance of her job.  She testified only that her co-workers would not help out when she needed an extra hand.  See Brown Aff. ¶ 169 (testifying that co-workers did not speak to her "unless they had to").  This at most unfriendly behavior is not sufficient to support a retaliation claim.

Brown's other allegations of retaliation are doubtful since she was unable in her deposition to point to any retaliatory actions by management.  See Brown III Dep. at 183-86.  In light of Brown's extensive affidavit testimony, however, the court considers other potential bases for retaliation.  Because Brown has not made clear whether she relies on the direct or indirect method of proof, the court considers whether she could succeed under either analysis.

The two incident reports generated on April 8th would not constitute materially adverse actions even for Brown's retaliation claim.  The standard for whether an adverse employment action is material is somewhat broader for retaliation claims than for discrimination claims.  See 42 U.S.C. §§ 2000e-2(a),

2000e-3(a); *Whittaker*, 424 F.3d at 648.  A plaintiff need not show that her employer's action altered the terms or conditions of her employment, but she must demonstrate that the action would have "dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Whittaker*, 424 F.3d at 648, quoting *Washington v. Illinois Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005).  Because they carried no apparent consequence for Brown's job, the two incident investigation reports fail this broader standard as well.  See *Whittaker*, 424 F.3d at 648 (rejecting written reprimands as materially adverse employment action for Title VII retaliation, as well as discrimination, claim:  "while one might argue that 'each oral or written reprimand brought [the plaintiff] closer to termination[,][s]uch a course was not an inevitable consequence of every reprimand'"), quoting *Oest v. Illinois Dep't of Corrections*, 240 F.3d 605, 613 (7th Cir. 2001).

Brown also may allege that Hill's retaliated against her by harassing her when she tried to arrange for physical therapy on April 3, 2003.  Brown offers no evidence of a causal connection between this event and her complaints or support of Isaacs, and of course the incident cannot be linked to her call to the Colgate hotline since that call had not yet been made.  Under the indirect method of proof, any retaliation claim based on this incident would fail, just as it did for Brown's discrimination claim.  She has not identified similarly situated male employees who did not engage in protected activity and were treated less favorably.

Finally, Brown alleges that Keinath and Haverkamp retaliated against her for calling the Colgate hotline by following her around and glaring at her while she worked in Stretchwrap.  Brown has presented no evidence from which a jury could conclude that the managers' alleged actions amounted to a retaliatory adverse employment action.  Brown claims that neither Keinath nor Haverkamp had come to the floor of the Stretchwrap area before.  See Brown III Dep. at 193.  She testified that Keinath would "stare" into the Stretchwrap area while Haverkamp would "walk around."  *Id.* at 194.  Brown testified that this made her uncomfortable, but she did not indicate that either manager interfered with her work or acted in even a remotely threatening way.  Accordingly, Brown's retaliation claim under both Title VII and the FMLA must fail.

IV.  *Constructive Discharge*

Brown contends that some or all of the conduct of which she complains also supports a claim for constructive discharge.  Constructive discharge, like actual discharge, is considered a materially adverse employment action under Title VII.  *EEOC v. University of Chicago Hospitals*, 276 F.3d 326, 331 (7th Cir. 2002).  To establish constructive discharge, however, an employee's working conditions must be not just "unreasonable" but "intolerable."  *Cooper-Schut v. Visteon Automotive Systems*, 361 F.3d 421, 428 (7th Cir. 2004) ("Absent extraordinary conditions, a complaining employee is expected to remain on the job while seeking redress.") (citations omitted).  The constructive discharge standard requires that working conditions be even more egregious than conditions that would support a hostile

-42-

work environment claim. *Whittaker*, 424 F.3d at 648, citing *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000).   The Supreme Court has recently formulated the objective test as follows:  "Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?"  *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004); *Levenstein v. Salafsky*, 414 F.3d 767, 774 (7th Cir. 2005).

Even when the evidence is viewed in the light most favorable to Brown, her resignation from Hill's cannot be considered a compelled response to intolerable workplace conditions.  In support of her constructive discharge claim, Brown points to the following events:  the derogatory language she was forced to tolerate by male co-workers every day, her two disciplinary incidents, the two incident investigation reports, the way she was shunned by co-workers (but not management) for supporting Isaacs, the April 3rd worker's compensation incident, and the fact that Haverkamp and Keinath watched her in Stretchwrap.  See Brown I Dep. at 61-62; Brown III Dep. at 73, 88-90.

It is undisputed that Brown's 2001 PIP for the date coding issue and her 2002 IIP for attendance issues occurred well before Brown left Hill's in June 2003 and that her performance agreement had expired before she left.  Brown cannot rely on her interactions with management on April 3rd as providing a basis for Title VII constructive discharge, since she has put forth no evidence that Hill's treatment of her was tied to her protected status as a female.  Finally, the two

incident reports cannot support a claim for constructive discharge, for the reasons explained above.

Brown's constructive discharge claim boils down to the way in which she was treated by co-workers, including their derogatory language and avoidance, and the fact that Keinath and Haverkamp watched her while she worked in Stretchwrap. Taken as a whole, these are not intolerable conditions that would cause a reasonable employee to quit. See, *e.g.*, *Whittaker*, 424 F.3d at 648-49 (conditions failing to meet high standards for hostile work environment could not reach even higher threshold to show constructive discharge); *Cooper-Schut*, 361 F.3d at 429 (no constructive discharge where alleged racial and sexual harassment was mild and did not go beyond "ordinary" Title VII violation); *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 735 (7th Cir. 2001) (no constructive discharge where supervisors, among other actions, monitored plaintiff to ensure she did not steal from customers); see also *Simpson v. Borg-Warner Automotive, Inc.*, 196 F.3d 873, 877 (7th Cir. 1999) (contrasting constructive discharge cases that involved escalating sexual remarks culminating in physical assault and death threats, with cases where "a range of unpleasant and embarrassing employer actions" was found tolerable). Brown does not contend that Haverkamp and Keinath looked at her in an improperly sexual way. Cf. *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 464 (7th Cir. 2002) (in assessing hostile work environment, noting that supervisor may not leer at subordinate's chest). Brown's own testimony that she made no complaints to Hill's management in the spring

of 2003 considerably undermines her allegation of intolerable working conditions. *E.g.*, *Lindale v. Tokheim Corp.*, 145 F.3d 953, 955 (7th Cir. 1998) (reversing judgment in favor of plaintiff on constructive discharge: "passivity in the face of working conditions alleged to be intolerable is often inconsistent with the allegation").

Moreover, no reasonable jury could find that Brown was reasonable in believing that she was about to be terminated.  In some cases, employees may establish constructive discharge by showing that they quit employment to avoid termination.  See, *e.g.*, *University of Chicago Hospitals*, 276 F.3d at 332 (issue of fact existed as to whether employee was reasonable in believing discharge was imminent when her belongings were packed and her office was used for storage). Brown relies on her observed treatment of other female technicians at Hill's to argue that she "knew from the harassment from the technicians and the managers that she would end up being fired." Pl. Resp. Br. at 31.  Brown testified that she was told by Jenkins that Isaacs should be fired for complaining, and she points to other examples of co-worker mistreatment of Isaacs.  Brown alleges that Isaacs was "forced" into sick leave and that Liz Bright, a female technician who also had complained about harassment and discrimination at Hill's, was eventually fired from the plant.[6]

---

[6]In October 2005, a jury rendered a verdict against Bright and in favor of Hill's in this court on all of Bright's claims under Title VII and the FMLA, including her claim of constructive discharge.  See *Bright v. Hill's Pet Nutrition*, 1:03-cv-1709 (Docket No. 140).

Much of the evidence Brown cites relating to the work experiences of Bright and Isaacs is either hearsay or irrelevant to her own situation.  Brown testified that she concluded she could no longer work at Hill's, and then Isaacs was "terminated."  See Brown Aff. ¶ 245.  Whether Isaacs was fired or not, Brown cannot rely on Hill's resolution of Isaacs' issues as a reason for believing she would be fired, since Isaacs apparently stopped working at Hill's only after Brown had left.  Second, Brown has no personal knowledge about the circumstances surrounding Liz Bright's departure from Hill's in November 2002, see Brown II Dep. at 82-83, and therefore Bright's situation could not have reasonably contributed to her own decision to leave in May 2003.  Most important, Brown overlooks at least one key difference between her and Bright at the times that their respective careers with Hill's ended.  Bright was in the company's disciplinary process when she left.  See Bright Dep. at 268-69 (Pl. Ex. C).  In Brown's case, on the other hand, her discipline had expired on May 17, 2003.  Were it not for her own failure to report to work during most of May, and possibly even in spite of this failure, Brown could not have reasonably believed that she was about to be fired.

Brown argues that the court must consider the letter that she sent to Mike Keinath on June 27th stating that she was forced to leave her employment.  She argues that this letter is "the most basic evidence" on the constructive discharge issue.  See Pl. Resp. Br. at 29.  This argument is frivolous.  Brown's letter does no more than confirm her own belief that she was constructively discharged, because it was sent at a time when she no longer worked at Hill's.  Her letter cannot create

a genuine issue as to whether her circumstances at the time she worked for Hill's were such that she had no choice but to leave.  Brown's constructive discharge claim fails as a matter of law.

V.      *State Law Retaliatory Discharge Claim*

Brown's state law constructive discharge claim also fails as a matter of law. Brown alleges in her complaint that defendants retaliated against her for filing a worker's compensation claim for the back injury that occurred on March 8, 2003. See Cplt. ¶¶ 1, 39.  In their motion for summary judgment, defendants argue that this claim must fail because only actual discharge, and not constructive discharge, can form the basis of a retaliatory discharge claim under Indiana law. See Def. Br. at 24-25.  Brown does not respond to defendants' argument in either her response or surreply brief.  In fact, her only acknowledgment of a separate state law claim is in the introduction to her response brief, where Brown argues generally that she was "one of the several female employees who were subjected to the sex discrimination, sex harassment, FMLA retaliation, *and worker's compensation retaliation.*"  Pl. Resp. Br. at 2 (emphasis added).  By not responding to defendants' motion for summary judgment on her state law retaliation claim, Brown has effectively abandoned this claim.  *E.g.*, *Lloyd v. Rolls-Royce Corp.*, 2003 WL 23101791, *11 (S.D. Ind. Aug. 26, 2003) (retaliation claim abandoned for failure to respond to defendant's motion for summary judgment).

Rule 56(e) states that "[i]f the adverse party does not so respond, summary judgment, *if appropriate*, shall be entered against the adverse party."  Fed. R. Civ. P. 56(e) (emphasis added).  Therefore, even where an opposing party completely fails to respond to a summary judgment motion, the district court must still ascertain whether judgment is proper under governing law.  *Johnson v. Gudmundsson*, 35 F.3d 1104, 1112 (7th Cir. 1994).

It is unclear whether Indiana law recognizes constructive discharge as a basis for a retaliatory discharge claim.  See *Cripe, Inc. v. Clark*, 834 N.E.2d 731, 735 (Ind. App. 2005) (reversing denial of motion to dismiss retaliatory discharge claim on constructive discharge theory:  "even assuming that the constructive discharge doctrine applies in the context of a retaliatory discharge, the allegations contained in the complaint at issue are insufficient to demonstrate a constructive discharge").

Even if Brown's claim is legally cognizable, she has failed to come forward with evidence from which a reasonable fact-finder could conclude that she was constructively discharged for exercising her statutory right to worker's compensation.  Indiana's standards for constructive discharge mirror the federal standards discussed above.  See *Cripe*, 834 N.E.2d at 735 ("A constructive discharge occurs when an employer purposefully creates working conditions, which are so intolerable that an employee has no other option but to resign.").  Brown's allegation of constructive discharge based on worker's compensation

could be based only on the incident of April 3rd and the mere fact that she had filed for worker's compensation benefits. Brown may not rely on allegations regarding Hill's handling of her worker's compensation after she left Hill's. These events would not be relevant to whether she was constructively discharged.

Brown's state law claim fails for the same reasons that her claim of constructive discharge under federal law fails. Even when viewed in a light reasonably most favorable to Brown, the evidence is insufficient to support a finding that Brown's working conditions were so intolerable that she was forced to resign. Defendants' motion for summary judgment on Brown's state law retaliatory discharge claim is granted.

VI.   *Substantive FMLA Claim*

Finally, Brown raises several issues with respect to Hill's handling of her FMLA leave. First, Brown claims that she was entitled to FML for her absence in May 2002 when she took her daughters to the hospital following their car accident.[7] Second, Brown alleges that Hill's used FMLA absences against her to move her into the second stage of her IIP and to withhold her annual attendance bonus. With respect to this second argument, it is unclear whether Brown is alleging that Hill's improperly counted actual recorded FML absences (such as the

---

[7]Brown's related allegation that Hill's discriminated against her by allowing men to take hourly increments of FML but not allowing her to do the same is an allegation that would form the basis of a Title VII claim, not an FMLA claim. As discussed above, this allegation is time-barred under Title VII.

FML she took in 2000 and 2001 for surgery) toward the figure it used to determine discipline and bonuses, or whether she is just arguing that absences she believes should have counted as FML (such as the May 2002 incident) were improperly included in that figure.  Brown's argument fails in any form.

Hill's did not grant Brown FMLA leave in May 2002 when she missed the first half of her shift to take her daughters to the hospital.  Hill's does not dispute that Brown immediately notified Hill's that she was going to miss work or that she requested FML from the Human Resources office.  Instead, Hill's argues that Brown has presented no medical evidence demonstrating that her May 2002 absence was an FMLA-protected event.

The burden of proof on a claim brought under the substantive rights provision of the FMLA lies with the plaintiff, who must demonstrate by a preponderance of the evidence her eligibility for and her entitlement to the disputed leave.  *Diaz v. Fort Wayne Foundry Corp.*, 131 F.3d 711, 713 (7th Cir. 1997); see also *Haefling v. United Parcel Service, Inc.*, 169 F.3d 494, 499 (7th Cir. 2001) ("Whether an illness or injury constitutes a 'serious health condition' under the FMLA is a legal question that an employee may not sidestep in the context of summary judgment merely by alleging his condition to be so.").

The FMLA gives eligible employees the right to twelve work-weeks of unpaid leave during any twelve-month period for specified reasons.  Among those reasons

is "to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition."  29 U.S.C. § 2612(a)(1)(C).  A "serious health condition" is defined in the regulations as a condition requiring either inpatient care or continuing treatment by a health care provider.  See 29 C.F.R. § 825.114(a).  The regulations state that "treatment" may include examinations to determine if a serious health condition exists.  29 C.F.R. § 825.114(b).  It is not clear that this provision would cover a single visit to an emergency room.  See, *e.g., Ausler v. Engineered Polymer Solutions*, 2003 WL 21751838 (N.D. Ill. July 29, 2003) (employee not entitled to FML for taking stepfather to hospital following accident where stepfather was not admitted to hospital or injured so severely as to require continuing treatment).

Hill's argues that even if Brown were entitled to FML for this half-day, any denial of FMLA leave would be immaterial because Brown cannot show that this one absence caused any damages or had any effect on her employment.  Hill's contends that Brown's absenteeism rate, even excluding the May 2002 absence, would have been so far above plant norms that she would have been moved into the second stage of her IIP and received a lower bonus regardless.  See Vanderpool Aff. ¶¶ 6,7 (Brown's 76.5 hours of non-FMLA absences corresponds with 3.3% absenteeism rate where plant norm was 1%).  Brown responds by pointing to a chart that she says shows that many of the hours used against her to reach the 3.3% figure were actually FMLA absences.  This chart lists absenteeism rates for several Hill's employees, including Brown, from August 2001-August 2002 and

includes a handwritten notation somewhat near her name: "24.5 –> FML." See Brown Aff. Ex. 6.

Brown's explanation for what this chart represents is complete speculation. She has offered no evidence that any of her FML absences during the relevant period were included in the 76.5 hours figure, or even that she took FML absences during the relevant period. Even if her half-day absence were excluded from the 76.5 hours figure, her absenteeism rate would be well above the 1% plant norm. Because Brown has presented no evidence in support of her claim, defendants' motion for summary judgment on Brown's FMLA entitlement claim is granted.

*Conclusion*

Defendants' motion for summary judgment (Docket No. 32) is granted as to both defendants on all of plaintiff's claims. Final judgment shall be entered accordingly.

So ordered.

Date: March 2, 2006

_____
DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Ellen E. Boshkoff
BAKER & DANIELS
eeboshko@bakerd.com

Jane A. Dall
BAKER & DANIELS
jane.dall@bakerd.com

Richard L. Darst
COHEN GARELICK & GLAZIER
rdarst@fed-law.com

Rene M. Johnson
MORGAN LEWIS & BOCKIUS LLP
rjohnson@morganlewis.com

Susan W. Kline
BAKER & DANIELS
swkline@bakerd.com

George A. Stohner
MORGAN LEWIS & BOCKIUS
gstohner@morganlewis.com